## TRIBUNAL FEDERAL DE PRIMERA INSTANCIA
## PARA EL DISTRITO DE COLORADO

Causa Penal No. 90-cr-00130-PAB-01

Causa Penal No. 09 cr-00367-PAB-01

ESTADOS UNIDOS DE AMÉRICA,

        Parte acusadora,

Vs.

1. MIGUEL ÁNGEL CARO-QUINTERO,

        Acusado.

---

# REGLA 11(c)(1)(C) Y (B) ACUERDO DECLARATORIO Y CONSTANCIA DE HECHOS PERTINENTES A LA CONDENA

---

Los Estados Unidos de Norteamérica, a través del Fiscal Interino de la Procuraduría del Distrito de Colorado David M. Gaouette, a través de los Fiscales Federales Adjuntos abajo suscritos, y el suscrito Abogado Litigante (del Gobierno) del Departamento de Justicia de EE.UU.; y el acusado, MIGUEL ÁNGEL CARO-QUINTERO (Acusado), personalmente y por medio de sus abogados, Licenciados Walter B. Nash III, Stephen G. Ralls, y John M. Richilano, respetuosamente presentan el Acuerdo Declaratorio y Constancia de Hechos Pertinentes a la Condena a continuación, conforme lo establece D.C.COLO.LCrR 11.1 y las Reglas Federales de Procedimientos Penales. 11(c)(1)(C) y (B).

## I. ACUERDO DECLARATORIO

Conforme a las condiciones y disposiciones de la Regla 11 (c)( 1 )(C), en lo referente a las sentencias que se impondrán en la Causa 90-cr-00130-PAB-01 (Causa en Colorado) y en la

Página número 1 de 38



Causa 09 cr-00367-PAB-01 una causa trasladada al Distrito de Colorado, (Causa de Arizona) las partes respetuosamente presentan este propuesto acuerdo declaratorio solicitándole al Juez que imponga una sentencia que resulte en un período de encarcelamiento de no menos de diez (10) años y de no más de veinte (20) años, que será seguido de un período de libertad supervisada de hasta 5 años, y una cuota obligatoria de $100.00 por cada cargo por el que sea condenado, así como cualquier multa que imponga el Juez. Ejerciendo uso pleno de la Regla 11 (c)(1 )(C), si el Juez determina que se impondrá una sentencia fuera del marco acordado, el acusado puede retirar sus declaraciones de culpabilidad y la defensa y el gobierno pueden retirarse de este acuerdo declaratorio. Las sentencias que se impondrán para cada Cargo en el presente acuerdo serán simultáneas una con las otras.

*Causa de Arizona.* El Acusado y el Gobierno acuerdan a los traslados de Regla 20 de la Acusación Sustitutiva del Jurado Acusatorio del 31 de agosto de 1994 en el Tribunal de Primera Instancia del Distrito de Arizona Causa Número 94-205-TUC-JMR (Causa de Arizona), y a las Causas del Tribunal de Primera Instancia del Distrito de Arizona Números CR 88-256-TUC-FRZ y CR 94-396-TUC-JMR. El Acusado acuerda declararse culpable del Cargo Uno del Tribunal de Primera Instancia de dicha Acusación Sustitutiva del Distrito de Arizona en la Causa Número 94-205-TUC-JMR, el cual alega su participación voluntaria y a sabiendas en una confabulación de posesión con la intención de distribuir una cantidad de marihuana desde, o aproximadamente desde, noviembre de 1993 hasta agosto de 1994, en la jurisdicción del Tribunal de Primera Instancia del Distrito de Arizona, en quebrantamiento de 21 U.S.C.(Código de los USA por sus siglas en ingles) §§ 841(a)(1) y de 846. Consta con la presente que todos los otros cargos en la Causa Número CR-88-256-TUC-JMRen lo que

respecta al Acusado Caro-Quintero serían desestimados con prejuicio en el momento de la
presente sentencia si el Juez acepta este Acuerdo.

**Causa de Colorado.** El Acusado acuerda declararse culpable del Cargo Uno
(Confabular para Quebrantar la Ley contra Organizaciones Corruptas e Influenciadas por la
Extorsión – "RICO Conspiracy") en la Segunda Acusación Sustitutiva del Jurado Acusatorio.
El Cargo Uno imputa un quebrantamiento de la ley contra la Conspiración RICO 18 U.S.C. §§
1961, 1962, y 1963: conspirar a sabiendas para participar en la realización de un patrón de
actividades de extorsión en desacato de los términos de la Ley contra Organizaciones Corruptas e
Influenciadas por la Extorsión, incluyendo violaciones del Título 21 U.S.C. § 841(a)(1) y
(b)(1)(B), posesión a sabiendas con intención de distribuir y distribución a sabiendas de 100
kilogramos de una substancia y mezcla conteniendo una cantidad detectable de marihuana, en el
transcurso de un período desde, o aproximadamente desde, enero de 1983 hasta, o
aproximadamente hasta, diciembre de 1993.

Si el Juez acepta las declaraciones de culpabilidad del Acusado al Cargo Uno de la causa
de Colorado y el Cargo Uno del caso de traslado de Regla 20 de la causa 92-205-TUC-JMR, el
Gobierno presentará durante o previamente al momento de la sentencia, una petición para desestimar
el resto de las acusaciones en contra de este acusado solamente, en la arriba titulada causa del Distrito
de Colorado.

**Otros Cargos.** Este acuerdo tiene la intención de ser una resolución global para toda la
injerencia delictiva de este acusado, tanto en Estados Unidos o en México, cuando tal injerencia
pudiese resultar en cargos levantados en Estados Unidos. Las partes consideran que las leyes de

prescripción pertinentes extinguen la presentación de cualquier otro cargo nuevo contra este Acusado

en cualquier venia en Estados Unidos; el acusado ha estado bajo custodia desde el 20 de diciembre de

2001. La orden de extradición  (la cual es vigente solamente en la causa actualmente en proceso en el

Distrito de Colorado y Arizona con los Números de Causa 94-205-TUC-JMR y CR 94-396-TUC-

JMR) impide que este acusado pueda ser encausado por ningún otro cargo en Estados Unidos. Las

partes no tienen conocimiento de ninguna otra acusación pendiente contra este acusado en ninguna

otra parte en Estados Unidos a nivel estatal o federal.

### *Causa de Arizona de 1994.* Cargo Uno: Elementos del Delito de Confabular

Para probar que el Acusado es culpable del delito imputado en el Cargo Uno del Distrito

de Arizona, causa número 94-205-TUC-JMR, siendo una de las causas de traslado de Regla 20,

el Gobierno tiene que probar más allá de una duda razonable que:

| | |
|---|---|
| *Primero*: | El Acusado Miguel Ángel CARO-QUINTERO; |
| *Segundo*: | A sabiendas pactó con una o más personas; |
| *Tercero*: | Poseer a sabiendas con la intención de distribuir una cantidad de marihuana; |
| *Cuarto*: | Dentro de los límites del Distrito de Arizona; y |
| *Quinto*: | Lo hizo en o alrededor de las presuntas fechas, desde noviembre de 1993 hasta agosto de 1994. |

### *Causa de Colorado.* Cargo Uno: Elementos del Delito de la ley RICO

Correspondiente a las Instrucciones al Jurado sobre Patrón de Conducta del Décimo

Circuito (2005), para que un jurado pueda declarar al Acusado culpable del delito imputado en

el Cargo Uno, el jurado debe estar convencido que el gobierno ha comprobado cada uno de los

siguientes elementos más allá de una duda razonable:

| | |
|---|---|
| *Primero*: | Entre enero de 1978 y el 21 de julio de 1988, el acusado acordó unirse a una empresa que de hecho existía conforme se alega en la acusación del jurado acusatorio que; |
| *Segundo*: | La empresa afectó el comercio interestatal o el extranjero; |
| *Tercero*: | El Acusado a sabiendas se asoció o fue contratado por la empresa; |
| *Cuarto*: | El Acusado participó a sabiendas en un patrón de actividades de extorsión; y |
| *Quinto*: | El Acusado dirigió a sabiendas, o a sabiendas participó en el cometido de, la empresa por medio de ese patrón de actividades de extorsión. |

## II. PENAS ESTABLECIDAS POR LA LEY

La pena máxima establecida por la ley para el Cargo Uno, ley contra la Conspiración RICO en violación de U.S.C. §§ 1961, 1962 y 1963, es encarcelamiento por no más de veinte (20) años (o a Cadena Perpetua si las actividad extorsiva incluye una pena máxima de encarcelamiento de por vida), una multa de no más de $250,000.00, o ambos; hay una cuota impositiva especial obligatoria de $100.00; y el Juez puede imponer un período de libertad supervisada de no más de cinco (5) años.

La máxima pena establecida por la ley para el Cargo Uno, Confabular para distribuir marihuana en violación de 21 U.S.C. §§ 841(a)(1) y 846, es encarcelamiento por no más de cinco (5) años, una multa de no más de $250,000.00, o ambos; hay una cuota impositiva especial obligatoria de $100.00; y el Juez está obligado a imponer un período de libertad supervisada de dos (2) años.

En Conformidad con 18 U.S.C. § 3584, el encarcelamiento puede tomar lugar consecutivamente cuando se impongan sentencias por condenas de cargos múltiples. Este

acuerdo requiere sentencias simultáneas si el Acuerdo es aceptado por el Juez. Según la ley,

cuando las sentencias son dictadas al mismo tiempo, sentencias para condenas de

encarcelamiento se llevan a cabo simultáneamente a menos que el Juez ordene, o si es

decretado por una ley, que los períodos de encarcelamiento deben realizarse consecutivamente.

La condena por un delito grave puede producir la pérdida de derechos civiles incluyendo, a

manera enunciativa pero no limitativa, al derecho a poseer armas de fuego, a votar, a ocupar un

puesto como funcionario electo, y a participar en un jurado. Una violación de las condiciones

de libertad supervisada puede resultar en una sentencia adicional a la prisión. Además, luego de

recibir una última condena a raíz de una declaración de culpabilidad por un delito grave, tal

condena puede causar que el Acusado sea deportado de los Estados Unidos una vez cumplido

cualquier período de encarcelamiento.

El Gobierno afirma respetuosamente que el cálculo de crédito por tiempo ya cumplido

por reclusión previa al juicio es asunto para la Dirección de Penitenciarías de EE.UU. El

Gobierno se opone a que el Juez determine la cantidad de crédito por tiempo cumplido por

reclusión previa al juicio al emitir la sentencia del acusado. El acusado se reserva el derecho a

pedir que el Juez emita un fallo en lo que respecta a su reclusión previa al juicio. El Gobierno

da por sentado que el Juez ha emitido fallos previamente en lo que respecta al crédito por

reclusión previa al juicio como parte del proceso de dictar las sentencias para otros acusados en

esta causa. Siempre y cuando la Dirección de Penitenciarías de EE.UU. determine que el

acusado reúne los requisitos establecidos en el Título 18, Código Penal de Estados Unidos,

Artículos 35 85(b)(1) y (2), los cuales establecen inter alia que el tiempo "no haya sido

acreditado en relación a otra sentencia", las partes esperan que el acusado reciba crédito por el

tiempo cumplido mientras estaba detenido oficialmente en Estados Unidos a partir de su

extradición y en México mientras esperaba su extradición a Estados Unidos conforme con el

pedido de extradición oficial. Las partes acuerdan que el acusado fue detenido por orden de

arresto por solicitud de extradición en México, el 20 de diciembre, 2001, y ha permanecido en

reclusión oficial en México o en Estados Unidos desde entonces.

El acusado deberá tener el derecho a solicitar protección judicial a este Juez en caso de

que la Dirección de Penitenciarías de EE.UU. se niegue a reconocer su reclusión previa a la

sentencia de una manera que sea proporcional y consistente al trato que han recibido otros

acusados en casos relacionados, pero no en conformidad a la ley pertinente, o de manera

contraria a las condiciones explícitas o implícitas de todo fallo del Juez en el presente. El

Gobierno se reserva el derecho a oponerse a que se conceda tal protección judicial.

## III. ESTIPULACIÓN A UNA BASE DE HECHOS Y DE LOS HECHOS PERTINENTES A LA SENTENCIA

Las partes acuerdan que no hay desavenencia por lo que respecta a los elementos

materiales que establecen una base de hechos para los delitos de estas condenas. Sin embargo,

las partes respetuosamente advierten al Juez que las partes están en desacuerdo en la aplicación

de los principios de USSG (Pautas de Condenas de los USA por sus siglas en ingles) §1B1.3

en lo respectivo a la conducta delictiva pertinente a esta causa. Relativo al alcance, naturaleza

y extensión de la conducta delictiva pertinentes en lo concerniente al cálculo de la Pauta de

Condenas, las partes pueden presentar testigos, proponer para su admisión,  presentar pruebas,

y desarrollar alegatos en apoyo a sus posiciones al momento que se imparta sentencia. Las

partes acuerdan que la Pauta de Condenas es de carácter consultivo por naturaleza y que el

Juez impartirá la sentencia de acuerdo a los factores y condiciones delineados por 18 U.S.C. §§
3553(a) y 3584. Hechos pertinentes han sido establecidos a continuación para facilitar una base
de hechos  para el acuerdo declaratorio y ofrecer algunos de los hechos que las partes
consideran pertinentes, en conformidad con USSG § 1B1.3, referente al cómputo del margen
apropiado de pautas. Debido a que hay un grado de desacuerdo entre las partes sobre los hechos
relevantes a la sentencia, las partes han tratado de identificar para el Juez los hechos en litigio
conocidos al momento de la declaración de culpabilidad. USSG § 6B1.4(b). Las partes
informan de esta manera nuevamente al Juez que cada una se reserva el derecho a litigar, en
base a alegatos y la presentación de pruebas, u otros medios, los límites con fundamento de
USSG § 1B1.3a la conducta delictiva del delito en lo concerniente a las disposiciones del
Juez.

Las partes dan fe que estos hechos son los que el Gobierno confía en comprobar en
juicio y que algunos de los hechos tomaron lugar fuera del marco de tiempo de 1985-1988 en
que Mario Caro-Quintero, Harold Hughes, Robert Mackesy, y otros participaron en la
conducta imputada en el Cargo Uno. Algunas de las actividades de Hughes, por ejemplo,
tomaron lugar antes de que Hughes conociera a Rafael o a Miguel CARO-QUINTERO. Las
partes acuerdan que el Acusado Miguel CARO-QUINTERO participó en numerosos actos
enumerados en el presente documento, también acuerdan que él no participó en, ni tenía
conocimiento de cada asunto manifiesto en este documento.

La constancia de hechos aquí presente no excluye que cualquiera de las partes
presenten o aleguen, concerniente a la sentencia, hechos adicionales o factores no incluidos en
el presente documento que sean pertinentes a el cómputo de una pauta, a USSG § 1B 1.3, o a la

sentencia en general en conformidad con las condiciones y factores en el Título 18 U.S.C. §

3553(a). USSG § 1B1.4., que dispone, en parte: "Al establecer la base de hechos para la

sentencia, el Juez tomará en consideración lo estipulado [por las partes], junto con los

resultados de la investigación pre-condenatoria, y cualquier otra información pertinente".

USSG § 6B 1.4, comentario.

Las pruebas del Gobierno demostrarán que la fecha en que la conducta pertinente al

delito (USSG § 1B 1.3) comenzó en, o alrededor de, enero de 1983 y continuó hasta, o

alrededor de, abril de 1994. El Gobierno acuerda que la participación del Acusado Caro-

Quintero se realizó desde, o alrededor de, 1985 hasta 1988 para el caso de Colorado, y en 1993-

1994 en el caso de Arizona.

El Acusado admite que estaba involucrado como una fuente de suministro de marihuana

conforme se le imputa en el Cargo Uno de la acusación sustitutiva de jurado acusatorio de

Arizona, y el Cargo Uno de la acusación sustitutiva de jurado acusatorio de Colorado. En lo que

respecta al Cargo Uno de la acusación sustitutiva de jurado acusatorio de Arizona, el Acusado

admite que el hombre detenido y condenado en conexión a más de 1000 kilogramos de

marihuana entregadas en Arizona, trabajaba para el Acusado. En lo que respecta a los cargos de

Colorado, el Acusado admite de hecho que él era *una* fuente de suministro de cantidades de

marihuana entre 1985 y 1988 para la empresa RICO (involucrando a Harold Hughes, Robert

Mackesy, y a otros) tal como está descrito en el Cargo Uno de la causa de Colorado, pero el

Acusado sostiene que Hughes, Mackesy y otros tenían fuentes alternativas de suministro para la

empresa RICO, además de la del acusado. Por lo tanto, el Acusado se reserva el derecho a

refutar la cantidad de marihuana que se le puede atribuir debidamente al Acusado como

conducta delictiva pertinente bajo la aplicación de los principios de USSG § 1B1.3.

El Gobierno respetuosamente declara que las pruebas pertinentes a la sentencia, en breve, serían de la siguiente manera:

**Causa de Arizona de 1994:** Los hechos generales que perfilan el delito imputado en el Cargo Uno de la causa de Traslado de Regla 20 de Arizona en 1994 son aquí establecidos: Un individuo colaborador con considerables antecedentes en el tráfico de la marihuana con el Acusado, comenzó a cooperar con los investigadores de la DEA en 1993. El colaborador hizo arreglos para presentarle a un agente encubierto de la DEA personas que trabajaban para, y con, el Acusado. En noviembre de 1993, el agente encubierto de la DEA se reunió con representantes del Acusado en Tucson, Arizona. Los hombres dialogaron sobre el contrabando de toneladas de marihuana desde México hasta los Estados Unidos donde sería entregado al agente encubierto. Conforme pasaron los meses, se realizaron llamadas entre el individuo cooperando y el Acusado y estas fueron grabadas por los investigadores. Eventualmente, más de 1000 kilogramos de marihuana fueron entregados a investigadores encubiertos en Estados Unidos por los hombres que estaban trabajando para y con el Acusado.

Se grabaron comunicaciones subsecuentes entre el Acusado, el individuo cooperando, y un agente encubierto de la DEA en relación a la calidad de la marihuana y sobre el pago de la marihuana que había sido entregada. Eventualmente dos hombres que estaban trabajando para y con el Acusado fueron detenidos en los Estados Unidos y encausados en Estados Unidos en conexión a los cargamentos de marihuana. En o alrededor del 11 de abril de 1995, uno de los trabajadores del Acusado fue condenado a 96 meses de encarcelamiento, seguidos de 60 meses

Página número 10 de 38

de libertad supervisada por el Cargo Uno en la Causa No. 94-205-TUC-JMR del Distrito de

Arizona. En o alrededor del 27 de abril de 1995, el otro hombre fue condenado en la Causa

No. 94-205-TUC-JMR del Distrito de Arizona y fue sentenciado a 36 meses de

encarcelamiento por el Cargo Uno, seguidos de 60 meses de libertad supervisada.

**Causa en Colorado:** Los investigadores del Gobierno se involucraron en la

investigación de una organización de contrabando de marihuana que era encabezada entonces

por Miguel Ángel CARO-QUINTERO y que incluía a Harold Allen HUGHES en relación al

Distrito de Colorado. Los investigadores del Gobierno determinaron que Rafael CARO-

QUINTERO, Harold Allen HUGHES y otros coconspiradores estaban involucrados en el

negocio del tráfico de narcóticos[1] remontándose a fines de la década de 1970. Miguel Ángel

CARO-QUINTERO nació en 1963 y había tenido alguna participación con la organización que

encabezó su hermano Rafael aproximadamente en 1980. Cuando Rafael CARO-QUINTERO

fue detenido en 1985, Miguel CARO-QUINTERO asumió un papel de mayor prominencia en

la organización. Los investigadores determinaron que la organización CARO-QUINTERO era

responsable de la distribución de muchas toneladas de marihuana por todo Estados Unidos. En

general, la marihuana era pasada de contrabando a Estados Unidos desde México por miembros

de la organización y por otros. Durante el transcurso de la investigación, los investigadores del

Gobierno tuvieron la oportunidad de entrevistar a numerosos testigos, repasar informes y

declaraciones juradas creadas por otros agentes del orden público investigando el contrabando

de marihuana en el Suroeste de Estados Unidos y en otras partes, y para discutir con otros

---

[1] El término "narcóticos" está siendo utilizado en el contexto de este acuerdo declaratorio con un
significado amplio para denotar y connotar el tráfico delictivo en substancias controladas, que
incluye la marihuana.

miembros de las fuerzas del orden público sobre otras investigaciones relacionadas con el contrabando de marihuana.

Durante la investigación, por medio de entrevistas a testigos/fuentes de información, los investigadores del Gobierno se dieron cuenta que Miguel Ángel CARO-QUINTERO era una fuente de marihuana a gran escala en México, para coconspiradores y asociados que recibían y distribuían regular y repetidamente cantidades de marihuana en toneladas dentro de Estados Unidos, constituyendo así un patrón sostenido de actividad delictiva. HUGHES trabajó íntimamente con Miguel Ángel CARO-QUINTERO. HUGHES actuó como un punto de contacto para la empresa, funcionando como coordinador, agente, y como intermediario para CARO-QUINTERO y sus asociados en Estados Unidos. El Gobierno afirma que toda la marihuana que Hughes obtuvo en el marco de tiempo de 1985-1988 venía de Miguel CARO-QUINTERO.

En o alrededor del 19 de junio de 1990, los investigadores del gobierno entrevistaron a una fuente de información que estaba cooperando con el gobierno (a quien denominaremos S-1 de aquí en adelante) en lo que concierne a las actividades de narcotráfico de HUGHES y sus asociados. S-1 informó a los investigadores del Gobierno que S-1 ha conocido a Harold HUGHES desde 1979 y que S-1 se había involucrado en la distribución de narcóticos con Harold HUGHES. S-1 también informó que conoció a varios individuos involucrados con HUGHES en el contrabando y distribución de narcóticos.

S-1 llegó a conocer a Robert Ayer MACKESY, quien distribuía en Estados Unidos marihuana suministrada por HUGHES, y a varios de los asociados de MACKESY. S-1

conoció también a Antonio José VILLARREAL-Ulloa, quien transportaba dinero de Estados

Unidos a México para HUGHES. S-1 conoció también a varios de los pilotos que utilizaba

HUGHES para volar cargamentos de marihuana desde México a los Estados Unidos. S-1

conoció a René Martín Verdugo, socio íntimo de HUGHES que era parte de la Organización

CARO-QUINTERO y quien se encuentra encarcelado ahora en Estados Unidos.

S-1 informó a investigadores del Gobierno que la primera vez que S-1 conoció a

MACKESY fue alrededor de abril de 1986 en Santa Fe, Nuevo México. S-1 estaba tratando de

obtener una identificación falsa para S-1, y HUGHES había recomendado que  S-1 fuera con

MACKESY.

S-1 les dijo a los investigadores del Gobierno que aproximadamente en marzo de 1987,

S-1 contactó a HUGHES en México por teléfono desde Colorado y que S-1 le dijo a HUGHES

que S-1 necesitaba algo de marihuana para vender y ganar algo de dinero. HUGHES le dijo a

S-1 que HUGHES tenía aproximadamente 1,000 libras de marihuana en Scottsdale, Arizona,

las cuales HUGHES ofreció venderle a S-1 por un precio de $1,200.00 por libra. HUGHES le

dio a S-1 el número del buscador electrónico de MACKESY y le dijo a S-1 que contactara con

MACKESY. HUGHES le dijo a S-1 que MACKESY  haría los arreglos para que la marihuana

le fuera llevada a S-1.

Los investigadores del Gobierno fueron informados que al día siguiente, S-1 y un

acompañante llegaron a Scottsdale, Arizona. S-1 usó el número de buscador electrónico que

HUGHES le había dado a S-1, y contactó a MACKESY. S-1 y MACKESY acordaron reunirse

en el Restaurante Red Robin en Scottsdale. S-1 declaró que S-1 se reunió con MACKESY  y

otro individuo identificado como Douglas McPheron, alias, Douglas PECK. S-1 le dijo a

MACKESY que S-1 solo quería 100 libras de marihuana. S-1 expresó a los investigadores del

Gobierno que MACKESY y McPheron se fueron con la casa rodante de S-1 y regresaron en

menos de una hora con 110 libras de marihuana, aproximadamente, en la casa rodante.

Los investigadores del Gobierno se enteraron que S-1 se marchó de Scottsdale y manejó

hasta Flagstaff, Arizona, donde S-1 pasó la noche. Al día siguiente, S-1 se reunió con uno de

los clientes de S-1, y S-1 le dio al cliente 50 libras de marihuana aproximadamente para venta a

consignación. Los investigadores del Gobierno fueron informados que luego de salir de

Flagstaff, S-1 manejó hasta Page, Arizona, donde S-1 distribuyó otras 50 libras de marihuana

para otro cliente para la reventa. S-1 indicó que S-1 regresó entonces a Colorado con

aproximadamente 10 libras todavía en posesión de S-1.

S-1 notificó a los investigadores del Gobierno que S-1 había recibido pago de uno de los

clientes de S-1 por la marihuana en abril de 1987 aproximadamente. Ese dinero, junto con

dinero proveniente de otros cargamentos de marihuana que le pertenecía a HUGHES, y que

habían sido vendidos por S-1, fue trasladado a Tucson, Arizona, por S-1. S-1 le comunicó a los

investigadores del Gobierno que, una vez en Tucson, S-1 se reunión con un individuo llamado

Tony (identificado más adelante como José Antonio VILLARREAL-Ulloa, alias, Antonio

Hernández). S-1 declaró que VILLARREAL-Ulloa llevó el dinero al otro lado de la frontera, a

México, y le entregó el dinero a HUGHES como pago por la marihuana.

S-1 les dijo a los investigadores del Gobierno que S-1 trató con VILLARREAL-Ulloa

por cinco o seis meses aproximadamente. S-1 calculó que durante 1987, se le entregaron

aproximadamente, seis millones de dólares a VILLARREAL para que se le entregaran a
HUGHES. Entre mayo y julio de 1988, S-1 le entregó otros dos millones de dólares a
VILLARREAL.

S-1 indicó a los investigadores del Gobierno que a fines de 1987, HUGHES comenzó a
llevar por avión cargamentos de marihuana de Miguel Ángel CARO-QUINTERO al área de St.
George, Utah. S-1 declaró que S-1, tanto como MACKESY, iban a St. George, Utah, a traer
cargamentos de marihuana después de ser transportados por aire en el avión de HUGHES a
Estados Unidos desde México. S-1 declaró que uno de los aviones utilizados por HUGHES
para pasar el contrabando de marihuana al área de St. George, Utah, fue abandonado por el
piloto y fue confiscado por las autoridades del orden público. Los investigadores del Gobierno
verificaron esta información por medio de la causa número FF13MZ9FF001 de la Aduana de
EE.UU.

S-1 informó a los investigadores del Gobierno que HUGHES le dijo a S-1 que uno de
los cargamentos de marihuana de MACKESY había sido confiscado por agentes del orden
público y que el chofer de MACKESY había sido detenido en diciembre de 1987. MACKESY
le dijo a S-1 más tarde que uno de sus choferes (de MACKESY) llamado "Brian" (identificado
más tarde como Brian BAILIA, alias, Brian Williams) había sido detenido en un retén en Utah.
Los investigadores eventualmente se enteraron que el cargamento de marihuana que había sido
incautado en el retén iba dirigido a MACKESY y a otro asociado denominado Ronald
FISHMAN.

Los investigadores del Gobierno repasaron informes completados por la oficina de la

DEA en Salt Lake City, así como por la Patrulla de Carreteras de Utah, y por el Departamento

del Sheriff del Condado Emery, en Utah, en que se detalla la confiscación de 1,200 libras de

marihuana aproximadamente, el 3 de diciembre de 1987, las cuales habían sido descubiertas

como resultado de un retén en la carretera interestatal 70. Al repasar los informes arriba

mencionados, los investigadores del Gobierno se percataron que los agentes trabajando en el

retén habían detenido a "Brian WILLIAMS" después de que los agentes localizaran marihuana

en el vehículo que BAILIA conducía. BAILIA conducía una camioneta Chevrolet matriculada

en el estado de Nevada a nombre de George Gray.

Los investigadores del Gobierno realizaron una búsqueda de los antecedentes de la

matrícula del vehículo y se enteraron que el vehículo había sido comprado por Thomas GRIEK,

usando el nombre falso Thomas GALE, el 11 de enero de 1986 en Spedding Chevrolet en

Denver, Colorado. Los investigadores del Gobierno se enteraron que  Thomas GRIEK era "la

mano derecha" de Robert MACKESY, y que GRIEK, era  responsable frecuentemente por

obtener vehículos que iban a ser utilizados para transportar marihuana, así como para obtener

residencias que se utilizarían para almacenar marihuana, como parte de sus obligaciones en la

empresa de MACKESY. Los investigadores del Gobierno determinaron que después de la

compra y matrícula del vehículo (que fuera luego conducido por BAILIA durante la

confiscación del 3 de diciembre de 1987) en Colorado a nombre de Thomas Gale, el vehículo

fue matriculado nuevamente en Nevada, a nombre de George Gray. El vehículo, no obstante,

continuó siendo propiedad de la organización MACKESY en todo momento, hasta la

confiscación en el retén.

Los investigadores del Gobierno se enteraron que Brian BAILIA, utilizando el nombre

falso "Brian WILLIAMS" fue sentenciado a libertad vigilada por poseer marihuana a raíz de la

confiscación del 3 de diciembre de 1987. Los investigadores del Gobierno notaron que BAILIA

completó su libertad vigilada en el estado de Utah bajo su nombre falso y que su verdadera

identidad nunca fue revelada a las autoridades en Utah.

S-1 informó a los investigadores del Gobierno que (en febrero de 1988) S-1 recibió una

llamada telefónica de HUGHES aproximadamente dos meses después de que el cargamento de

marihuana fuera confiscado en Utah. HUGHES le informó a S-1 que su suministrador de

marihuana, Miguel CARO-QUINTERO, quería su dinero por el cargamento que había sido

confiscado en Utah, y que HUGHES necesitaba dinero inmediatamente. S-1 les dijo a los

investigadores del Gobierno que MACKESY no le había pagado a HUGHES por el

cargamento que había sido incautado.

S-1 le dijo a los investigadores del Gobierno que HUGHES le ordenó a S-1 que fuera a

Pagosa Springs, Colorado, y que sacara $1, 200,000.00 que estaba enterrado en una residencia

que le pertenecía a Mark Winter. S-1 dijo que el dinero había sido enterrado en Agosto de 1981.

S-1 viajó a Pagosa Springs, Colorado, como lo pidió HUGHES, y S-1 desenterró el

dinero en la propiedad de Winter. S-1 descubrió que quedaban aproximadamente $850,000.00

del los $1, 200,000.00 que había al principio. S-1 le dijo a los investigadores del Gobierno que

S-1 contactó a HUGHES y le avisó a HUGHES sobre la falta de dinero. S-1 dijo que HUGHES

se puso muy molesto pero que no había nada que HUGHES pudiera hacer, dado que estaba en

México. Los investigadores del Gobierno verificaron esta información recuperando la tubería

de plástico que contenía el dinero que recuperó S-1 en Pagosa Springs, Colorado.

S-1 declaró que entonces S-1 viajó a Tucson, Arizona, donde S-1 se reunió con VILLARREAL-Ulloa. S-1 le dio los $850,000.00 a VILLARREAL-Ulloa. VILLARREAL-Ulloa estaba supuesto a transportar el dinero al otro lado de la frontera y llevárselo a HUGHES, para que HUGHES pudiera pagarle a CARO-QUINTERO por la marihuana confiscada en Utah.

El 14 de febrero de 1992, investigadores del gobierno entrevistaron a una fuente de información denominada de aquí en adelante como S-2. S-2 le dijo a los investigadores del gobierno que en 1977, S-2 se había mudado a Caborca en el estado de Sonora, México.

Aproximadamente en 1982 o 1983, S-2 oyó que la organización de CARO-QUINTERO tenía vastos bienes raíces en el área de Caborca, México, en los cuales la organización de CARO-QUINTERO estaba cultivando marihuana. S-2 declaró que la marihuana se estaba cultivando en ranchos que eran propiedad de amigos, parientes y socios de Rafael y Miguel Ángel CARO-QUINTERO.

En 1985, Enrique ACOSTA-CASTRO, una persona encargada de una bomba de irrigación que era conocida de S-2, le ofreció a S-2 la administración de la oficina de negocios de varios ranchos del área. S-2 entonces comenzó a administrar la oficina encargada de los negocios de la "ASOCIACIÓN DE GANADEROS," un grupo de ganaderos del área. S-2 declaró que todos los ranchos eran propiedad de familiares de CARO-QUINTERO como primos, cuñados, etc.

Durante el tiempo en el que S-2 trabajó para la asociación, recibía órdenes de ambos Miguel Ángel CARO- QUINTERO y ACOSTA-CASTRO. Después de un corto periodo de tiempo, S-2 renunció y regresó a trabajar como ganadero. En abril de 1986, ACOSTA-CASTRO

le pidió a S-2 que fuera a Tijuana, México para que recogiera un dinero. S-2 manejó de Caborca
a Tijuana en un Volkswagen "Beetle" el cual le fue proporcionado por ACOSTA-CASTRO.

Una semana después, S-2 hizo otro viaje a Tijuana puesto que ACOSTA-CASTRO se lo
pidió. S-2 declaró que él traía $700,000.00 en cada viaje y que ganaba $7,000.00 en cada viaje
por haber traído el dinero.

En julio de 1986, ACOSTA-CASTRO le dijo a S-2 que fuera a recoger un dinero a Fénix,
Arizona. Se le dio a S-2 un número de buscador electrónico y se le dijo como operar el
buscador electrónico. Una vez que S-2 llegó a Fénix, llamó al buscador electrónico y el que le
regresó la llamada le dijo a S-2 que alguien lo iba a ir a encontrar. S-2 recuerda que el que lo fue
a encontrar era "WOODY" (Thomas GRIEK-identificado por foto) y entonces S-2 y GRIEK
manejaron el Volkswagen que S-2 llevaba a un lugar donde había mini unidades de
almacenamiento. S-2 metió el vehículo en una de las unidades de almacenamiento y entonces S-2
y GRIEK escondieron $500,000.00 en moneda estadounidense en el vehículo.

Una vez que regresó a México, le presentaron a S-2 a Harold HUGHES, alias Mike
COOPER. Le dijeron a S-2 que HUGHES tenía algunos problemas en los Estado Unidos y que
recientemente se había mudado de Baja a Caborca. S-2 posteriormente se enteró que HUGHES
se había fugado de Baja, México cuando arrestaron a René VERDUGO.

Aproximadamente dos semanas después de la reunión inicial que tuvo con GRIEK,
HUGHES le pidió a S-2 que fuera a Fénix y que se volviera a reunir con GRIEK. S-2 manejó a
Fénix, nuevamente usó el buscador electrónico y se reunió con GRIEK. S-2 le recogió
$500,000.00 a GRIEK y se regresó a Caborca, a entregarle el dinero a HUGHES. A S-2 le
pagaron $5,000.00 por haber llevado por auto los $500,000.00.

En septiembre de 1986, S-2 le recogió a GRIEK para entregarle a HUGHES entre $300,000.00 y $500,000.00 y en octubre de 1986, S-2 recogió de GRIEK para entregarle a HUGHES de $300,000.00 a $500,000.00 adicionales. Aproximadamente de noviembre de 1986 hasta enero de 1987, S-2 dijo que como cada 15 días le recogió a GRIEK entre $300,000.00 y $400,000.00.

S-2 también conoció a "Joe Bob" (Joe Neal OTTER), el cual vendía marihuana para HUGHES. S-2 recuerda haber conocido a OTTER en otra ocasión, cuando OTTER tenía una gran cantidad de artículos personales (como ropa, etc.) para que S-2 se los entregara a HUGHES a tal grado que S-2 dijo que él tuvo que hacer dos viajes entre Arizona y Caborca. OTTER también le dio a S-2 $500,000.00. El efectivo y los artículos personales que OTTER le dio a S-2 le fueron entregados a HUGHES.

En enero de 1987, S-2 conoció a "Bob" (Robert MACKESY- identificado por foto) y a "Ron" (Doug MCPHERON - identificado por foto) en Fénix. HUGHES le dijo a S-2 que MACKESY era "el jefe " y que era muy rico.

En febrero de 1987, S-2 se reunió con OTTER entre Tucson y Fénix y en ese entonces OTTER le dio a S-2 $50,000.00. S-2 le entregó el dinero a HUGHES y HUGHES le pasó el dinero a Miguel Ángel CARO-QUINTERO, que era al que le partencia el dinero, según lo que le dijo HUGHES a S-2.

A principios de 1987, S-2 recogió a MACKESY y a GRIEK en Tucson y los transportó a Caborca para que se reunieran con HUGHES. S-2 recuerda que dicha reunión duró más o menos solo un día. S-2 declaró que durante abril de 1987, el le transportó a HUGHES como $850,000.00, los cuales fueron obtenidos de SEIFERT y MCPHERON. En abril de 1987, la oficina/tienda de HUGHES y la residencia de Miguel Ángel CARO-QUINTERO fueron bombardeadas. S-2 recuerda que eso sucedió por el 12 de abril de 1987. HUGHES entonces se

Página número 20 de 38

mudó a Rocky Point, México.

En mayo de 1987, S-2 le recogió a OTTER en Tucson una carga en efectivo. S-2 recuerda que el dinero estaba mojado y mohoso y S-2 recuerda que OTTER le dijo que el dinero había estado enterrado. OTTER también le dijo a S-2 que faltaba dinero puesto que se había sacado algo mientras que estaba enterrado. S-2 cree que únicamente él, OTTER y HUGHES sabían que faltaba dinero. S-2 cree que OTTER le dio como $700,000.00.

S-2 declaró que en o aproximadamente de enero a abril de 1987, como dos veces al mes, les recogió a OTTER y a MACKESY entre $300,000.00 y $500,000.00. En o aproximadamente de mayo a julio de 1987 S-2 recogió solo como $100,000.00 de cada uno de los grupos. Entonces en julio y agosto S-2 recogió un pago muy grande. S-2 creía que era de $500,000.00 a $800,000.00. En o alrededor de septiembre hasta octubre de 1987, S-2 recogió, como enganche para la próxima temporada de cultivo, entre $100,000.00 y $200,000.00 dos veces al mes. Para noviembre de 1987, ya estaba S-2 nuevamente recogiendo de $300,000.00 a $500,000.00 cada dos semanas de los dos grupos; del de OTTER y del de MACKESY. Éste patrón continuó aproximadamente hasta agosto de 1988.

En el verano de 1987, Francisco COLLINS-AVILA, alias El Gordo, se le unió a HUGHES como socio. COLLINS-AVILA proporcionaba el transporte de la marihuana a los USA. S-2 indicó que COLLINS-AVILA controlaba pistas de aterrizaje y proporcionaba cuadrillas terrestres apoyando la transportación de la marihuana.

En agosto de 1988, OTTER llamó a HUGHES y le dijo del arresto de OTTER. Entonces HUGHES le dijo a S-2 que se encontrara con OTTER en Fénix para que le recogiera a él un dinero. S-2 le dijo a HUGHES que no quería ir a encontrarse con OTTER pero HUGHES lo convenció para que lo hiciera. Después de que OTTER y S2 habían hecho el intercambio, S-2

comenzó a manejar hacia la frontera. A S-2 lo detuvieron las fuerzas del orden público en los Estados Unidos, y el dinero fue decomisado. Se puso en libertad a S-2. S-2 se regresó a Caborca y le contó a HUGHES lo que había acontecido.

Se le preguntó a S-2 si en alguna ocasión había conocido a un piloto que trabajaba para HUGHES y que se llamaba "GREGORIO." S-2 declaró que él había visto al piloto en varias ocasiones y que él era un estadounidense llamado Gregory; posteriormente fue identificado como Gregory PETTIJOHN.

En o aproximadamente de diciembre de 1987 a enero de 1988, se le informó a S-2 que PETTIJOHN voló un avión a St. George, en el área de Utah. El avión se enfrió y no fue posible volverlo a encender, por lo tanto PETTIJOHN se vio forzado a abandonar el avión. La aduana estadounidense de Flagstaff, Arizona confirmó que en enero de 1988, un avión que había sido vinculado con PETTIJOHN fue decomisado en una pista de aterrizaje clandestina en el condado de Mojave, Arizona. El condado de Mojave en Arizona está ubicado a lo largo de la frontera entre Arizona y Utah, al sur de St. George, Utah.

Entonces se le preguntó a S-2 acerca de la relación entre HUGHES y Miguel Ángel CARO-QUINTERO. S-2 declaró que a él le era obvio que HUGHES obtenía su marihuana de CARO-QUINTERO. S-2 dijo que HUGHES hablaba mal de Miguel CARO QUINTERO cuando HUGHES recibía cargamentos de marihuana de baja calidad. S-2 declaró el había visto juntos a Miguel Ángel CARO-QUINTERO, a Enrique ACOSTA-CASTRO y a HUGHES en varias ocasiones.

S-2 entonces contó sobre como trató de reunirse en los Estados Unidos con un hombre desconocido poco después de que la Policía Judicial Federal Mexicana le decomisó a HUGHES seis kilogramos de cocaína. HUGHES le dijo a S-2 que se pusiera en contacto con una persona que estaba guardando, en los Estados Unidos, unos tapetes y pinturas valiosas. Cuando S-2

se comunicó por teléfono con ese sujeto, el sujeto se rehusó a hablar con él y le dijo a S-2 que
jamás le volviera a llamar.

Entonces se le preguntó a S-2 sobre una bodega de almacenamiento que había rentado
en Tucson bajo su alias. S-2 dijo que había usado la bodega para almacenar cosas que él le
había comprado a HUGES en los Estado Unidos. S-2 dijo que almacenaba cosas como llantas
bombas, comida, ropa de camuflaje, armas y municiones. Inclusive, HUGHES le construyó,
utilizando a una compañía de Fénix, una cancha de tenis a Miguel Ángel CARO QUINTERO.

En relación al historial de Robert MACKESY en el negocio de narcotráfico de marihuana,
el 4, 5, y 7, de marzo de 1991, investigadores del Gobierno llevaron a cabo una sesión informativa
estratégica con a una fuente de información, la cual será referida de aquí en adelante como S-4. S-4
declaro que MACKESY se crió en el área de Miami, Florida, y que allí él se entero de que había
muchas personas involucradas en la importación y distribución de narcóticos. En o alrededor de
1975, MACKESY comenzó a distribuir marihuana de y en los alrededores de la Florida.

En la primavera de 1985, MACKESY viajó a México donde MACKESY se reunió
con Harold HUGHES para ir a esquiar en agua. Gerald CUMMINGS, alias Jim
BRADSHAW  presentó a MACKESY  y a  HUGHES en algún momento en 1984. Un amigo
de Santa Fe, Nuevo México, Mark ZAPLIN  presentó a MACKESY y a CUMMINGS.
MACKESY había planeado tratar de usar a HUGHES como una reserva para suministro de
marihuana.

En o aproximadamente a finales de 1985, MACKESY trasladó su operación al oeste para
así poder usar a HUGHES como su fuente primaria de suministro. Los primeros cargamentos
que HUGHES le proporcionó a MACKESY  se trajeron por la vía aérea a Arizona y  California;
a lo largo de la frontera mexicana. Los empleados de MACKESY viajaban al desierto para

Página número 23 de 38

descargar la marihuana del avión. S-4 recuerda que el piloto que HUGHES usaba era "Gregorio," posteriormente identificado como Gregory PETTIJOHN. S-4 cree que PETTIJOHN era del área de Tucson, Arizona.  HUGHES  fue la única fuente de suministro de MACKESY en 1985 y 1986.

La marihuana entraba al país por México, y luego era llevada a un depósito clandestino de drogas en Fénix, Arizona. De Arizona, cargamentos de marihuana se llevaban por carro a una de las ubicaciones de depósito clandestino de drogas en Boulder, Colorado. De las ubicaciones de depósitos clandestinos en Colorado, se les distribuía la marihuana a los clientes de MACKESY.

Durante el periodo de tiempo que MACKESY trabajó con HUGHES, S-4 indicó que MACKESY conoció a varios de los trabajadores de HUGHES incluyendo a "Tony." S-4 identificó una foto de José Antonio VILLAREAL-ULLOA, alias Tony HERNANDEZ, como "Tony." S-4 declaró que "Tony" era un transportador de dinero de HUGHES. "Tony" escondía cargamentos  de $400,000.00 en los paneles de un vehículo y conducía el efectivo a México. A menudo HUGHES hablaba con MACKESY acerca de su fuente de suministro de marihuana. HUGHES le dijo a MACKESY que la marihuana venia de Miguel Ángel CARO-QUINTERO. Mackesy nunca recibió ninguna marihuana de Rafael CARO-QUINTERO. Cuando Mackesy entró en el juego, Rafael CARO-QUINTERO ya había sido arrestado y estaba en reclusión oficial.

S-4 declaró que a menudo HUGHES presionaba a MACKESY pidiéndole dinero para proporcionárselo a Miguel Ángel CARO-QUINTERO para que fuese invertido. HUGHES dijo que el propósito de ese dinero era proporcionarle a CARO-QUINTERO capital para negocios legítimos. MACKESY visitó a HUGHES en México en varias ocasiones. S-4 cree que entre 1985 y 1986, MACKESY recibió toda la marihuana que HUGHES estaba moviendo a los USA.

Página número 24 de 38

En o aproximadamente 1985 a 1986, Mark ZAPLIN le presentó a S-4 a Mark WINTER en una exhibición de arte en el hotel Hilton en Santa Fe. S-4 recuerda que ZAPLIN le dijo a él que WINTER le estaba guardando unos tapetes valiosos a HUGHES.

En o aproximadamente a finales de 1987, HUGHES transporto por avión cuatro cargamentos de marihuana al desierto de Utah-Arizona cerca de St. George, Utah. Los cargamentos llegaron en dos secciones. Una sección llegó en o finales de noviembre dos noches seguidas. La segunda sección llegó en o alrededor de principios de diciembre también dos noches seguidas. Se cree que todos los cargamentos fueron piloteados por Gregory PETTIJOHN. La marihuana de los cargamentos de noviembre fue llevada por auto al depósito clandestino de drogas de MACKESY, el cual era operado por YATES en el Bulevar Sheridan en Westminster, Colorado. El cargamento de la primera noche lo llevó por auto Brian BAILIA. El cargamento de la segunda noche lo llevó por auto Kerry TROY al mismo depósito clandestino de drogas en Colorado. El primer cargamento de marihuana de diciembre lo llevó Brian BAILIA de St. George por auto. S-4 dijo que se suponía que BAILIA iba a llevar la carga por auto a Colorado, hacer el inventario de la carga y luego llevarla por auto a los clientes de Eugene GRASS en la costa este. Se interrumpió el plan:

BAILIA fue arrestado teniendo en su poder un cargamento de marihuana en un retén en la carretera cerca de Green River, Utah. Kerry TROY llevó por auto al depósito clandestino de drogas de YATES el segundo cargamento de diciembre. En o aproximadamente finales de diciembre de 1987 se robaron ese cargamento del depósito clandestino de drogas. Conforme a S-4, estos fueron los últimos cargamentos que MACKESY hizo con HUGHES.

Entonces, en o aproximadamente 1989, MACKESY recibió un mensaje de una persona
Página número 25 de 38

desconocida diciéndole que HUGHES estaba en la prisión en México y que HUGHES

necesitaba efectivo. MACKESY accedió darle a esa persona $50,000.00 para que ese efectivo

se le pudiera hacer llegar a HUGHES en México. A finales del verano de 1989, MACKESY se

reunió con esa persona desconocida en San Francisco, California y MACKESY le dio a él

$50,000.00. S-4 recuerda que en una otra ocasión  MACKESY y Ronald FISHMAN le

enviaron a HUGHES a México $500,000.00 para que pagara por marihuana. FISHMAN tenía

el dinero en Boulder, Colorado, y uno de los choferes de FISHMAN lo llevó a Tucson, Arizona

lugar en el que el dinero se le entregó a un sujeto desconocido. S-4 declaro que ese pago se envió

a México antes de que HUGHES fuera a la prisión en México.

En mayo de 1990 y en varias ocasiones posteriormente, una una fuente de información

que estaba cooperando con el gobierno (de aquí en adelante la denominaremos como S-3) fue

entrevistada en relación a las actividades de narcotráfico de Robert MACKESY y asociados. S-3

ha proporcionado información que ha sido corroborada durante esta investigación. S-3 les

informo a los investigadores del Gobierno que S-3 había estado involucrado con Robert

MACKESY y que le había ayudado en la promoción  del negocio de marihuana desde 1980.

Cuando le estaba ayudando a MACKESY en el negocio de marihuana, S-3 fungió como chofer,

repartidor de marihuana, a veces recogiendo la marihuana de diferentes puntos en los Estados

Unidos y transportándola a Colorado.

Por S-3,  agentes del Gobierno se enteraron que S-3 recogió cargamentos de marihuana en

St. George, Utah, en varias ocasiones a finales de 1987 y que transportó en auto estos

cargamentos de marihuana a Colorado. S-3 les dijo a los investigadores del Gobierno que S-3

recuerda haber transportado cargamentos de marihuana de por lo menos 1,000 libras en o

alrededor de septiembre a diciembre de 1987. Los investigadores del gobierno han revisado los

records de varios hoteles en o alrededor de St. George, Utah corroborando la información dada

por S-3. S-3 les dijo a los investigadores del Gobierno que un co conspirador desconocido,

que un cargamento de marihuana había sido decomisado en algún lugar en Utah en o alrededor

principios de diciembre de 1987. S-3 declaró que S-3 estaba en St. George, Utah, esperando otro

cargamento cuando el cargamento fue decomisado. S-3 declaró que S-3 tenía conocimiento de

que el cargamento que fue decomisado era propiedad de Robert MACKESY y que el

cargamento acababa de salir de St. George, Utah.

Por medio de S-3, investigadores del Gobierno se enteraron que, basado en la

experiencia que S-3 tenía en sus tratos con Robert MACKESY, S-3 sabía que la marihuana que

fue decomisada en Utah provenía de la misma fuente común de la que provenían todos los otros

cargamentos que se le habían transportado a MACKESY a St. George, Utah. Agentes del

Gobierno confirmaron a través de otra fuente de información que el cargamento que se

decomisó en Utah durante diciembre de 1987 provino de HUGHES y de MIGUEL CARO-

QUINTERO. S-3 declaró que S-3 no tenía conocimiento personal sobre la fuente de la

marihuana, pero que sabía que se transportaba por avión de México a los Estados Unidos. S-3

les dijo a los investigadores del Gobierno que S-3 creía que la aeronave aterrizaba en pistas

clandestinas en el desierto y que entonces se descargaba la marihuana y era llevada a depósitos

de  almacenamiento clandestinos en St. George, Utah.

En marzo 22 de 2001, investigadores del Gobierno se reunieron con una fuente de

información referida de aquí en adelante como S-5, en Denver, Colorado, para entrevistar a S-5

en relación con las actividades de narcotráfico de Miguel Ángel CARO-QUINTERO y de

HUGHES. S-5 les dijo a los investigadores del Gobierno que HUGHES era un piloto y que el
hermano de HUGHES, Donald HUGHES, era propietario de una concesionaria de Cessna en
California. HUGHES estaba firmemente establecido como un traficante aéreo y narcotraficante
antes de que HUGHES conociera a Miguel Ángel CARO-QUINTERO. En 1967 HUGHES
comenzó a volar a Mazatlán, México en un avión Cessna. En Mazatlán HUGHES les compraba a
narcotraficantes mexicanos entre 250 y 300 kilogramos de marihuana, y transportaba la
marihuana por avión de regreso a California. La marihuana se le vendía a John Henry
CAPPELA en California.

HUGHES hizo esto por varios años hasta que HUGHES fue arrestado en México en
enero de 1969 por tenencia de 500 kilogramos de marihuana. HUGHES pasó 21 meses en la
prisión en Hermosillo, México. Cuando estaba en la prisión HUGHES conoció a Thomas
TAYLOR, alias SUMMERS, y a Chato SANTUNAS, que era un político en Guadalajara,
México. SANTUNAS estaba involucrado con otro individuo llamado Baldomero HOLGUIN.
Después de que HUGHES salió en libertad de la prisión, HUGHES transportó por avión a los
Estados Unidos, con estos individuos, como cinco o seis cargamentos de marihuana siendo cada
uno de ellos aproximadamente de 500 libras.

En 1970 HUGHES conoció a Wayne BROWN. BROWN le pagó a HUGHES $10,000.00
por viaje para que él transportara por avión cargamentos de marihuana aproximadamente de 250
a 300 kilogramos, a una pequeña pista de aterrizaje cerca de Blythe, California. Los cargamentos
se le entregaron a James THOMAS y a Everett WELBER. HUGHES voló para BROWN por
un par de años, e hizo como 10 viajes. También durante los años de 1971 a 1973 HUGHES
conoció a dos mexicanos en Mexicali, México llamados Juvenile DIAZ y José GUITON. DIAZ

y GUITON involucraron a HUGHES en el cruce fronterizo de vehículos cargados con pequeños

ladrillos de marihuana en la cajuela, yendo de Calexico, México a El Centro, California. Ellos

cruzaban tres o cuatro vehículos al día, y en cada uno de los vehículos había aproximadamente

250 libras de marihuana. Los vehículos viajaban a Los Ángeles y a Ventura, California, donde

se le entregaba la marihuana a Gerald CUMMINGS, Walter ANDERSON, Stephen THOMA,

Keith HICKENBOTTOM y a Mike HUITRON. S-5 calcula que durante ese periodo de dos

años se les entregaron a esos individuos entre 30 y 40 toneladas de marihuana.

S-5 dijo que en 1973 HUGHES, Juan ESPARRAGOZA y TAYLOR comenzaron a

cultivar su propia marihuana en México. El primer cultivo estaba cerca de Pericos, México y

rindió aproximadamente 30 toneladas de marihuana en las 20 hectáreas. Cada uno, HUGHES,

ESPARRAGOZA y TAYLOR recibió 10 toneladas. HUGHES continuó cultivando marihuana

de 1973 a 1980 en los estados mexicanos de Sonora, Sinaloa, y Chihuahua. HUGHES se hizo

socio de CUMMINGS, el cual tenía varios compradores a gran escala en los Estados Unidos y

en Canadá. La marihuana se cargaba en camiones VW, cada uno llevando entre 300 y 400

libras, y se conducían a través de Baja, México a Tijuana, México, donde cruzaban la frontera a

los Estados Unidos. CUMMINGS le presentó a HUGHES a David y a Brian ORTIZ, que eran

compradores de marihuana a gran escala.

En 1980 HUGHES  se fugó de Baltimore, Maryland a México y se retiró del negocio de

narcotráfico por un corto periodo de tiempo. HUGHES hizo un viaje al Perú, lugar en el que

HUGHES compró de 100 a 120 kilogramos de cocaína en pasta. HUGHES trajo la pasta de

regreso a México donde ESPARRAGOZA y Miguel FELIX-Gallardo querían aprender cómo

convertir la pasta en cocaína HCL. HUGHES trajo de regreso a un peruano para que les

enseñara cómo convertir la cocaína. HUGHES recibió 12 kilogramos de la cocaína para uso
personal y para dársela a sus amigos.

En 1983 a través de TAYLOR, HUGHES conoció a René VERDUGO, el cual acababa de de
salir de la prisión. VERDUGO era un íntimo asociado de Rafael CARO-QUINTERO. TAYLOR
en ese entonces quería que VERDUGO transportara 50 toneladas de marihuana de Manzanillo a
Mexicali a San Luis y que los introdujera a los Estados Unidos. VERDUGO comenzó a usar un
helicóptero para transportar por aire la marihuana a los Estados Unidos. La marihuana de Thai
le pertenecía a ANDERSON, a ESPARRAGOZA, y a TAYLOR. S-5 calcula que VERDUGO
contrabandeo como 186,000 libras en un periodo de 2 meses. Durante ese periodo de tiempo
VERDUGO quiso presentarle a HUGHES a Rafael CARO-QUINTERO, pero no fue sino
hasta 1984 cuando HUGHES conoció a Rafael CARO-QUINTERO en un restaurante en
Guadalajara, México.

Eventualmente, Rafael CARO-QUINTERO fue arrestado en México y Miguel Ángel
CARO-QUINTERO asumió un papel más importante en la organización CARO-QUINTERO.
Eventualmente, VERDUGO fue arrestado en los Estado Unidos. El día en que VERDUGO fue
arrestado en los Estados Unidos, VERDUGO había invitado a HUGHES a la boda de Alberto
SICLIA-Falcón, un amigo de VERDUGO. HUGHES fue a la boda, pero VERDUGO no se
presentó. El día siguiente HUGHES se enteró que VERDUGO había sido arrestado en los
Estados Unidos. Después de que se enteraron que habían arrestado a VERDUGO, Miguel Ángel
CARO-QUINTERO le dijo a HUGHES que HUGHES iba a ir a Caborca, México con Miguel
Ángel CARO-QUINTERO.

Después de que Miguel Ángel CARO-QUINTERO llevó a HUGHES a Caborca, México

HUGHES comenzó, para Miguel Angel CARO-QUINTERO, a entregarle marihuana a Robert

MACKESY y a Joe OTTER. Rutinariamente, la marihuana la llevaban por aire a los Estados

Unidos pilotos que HUGHES contrataba: GREGORY PETTIJOHN, KIM y CRAIG

PASSWAITER. HUGHES trabajó con Miguel Ángel CARO-QUINTERO hasta el momento en

el que HUGHES fue arrestado en México. S-5 calcula que durante ese periodo de tiempo

HUGHES vendió  para Miguel Ángel CARO-QUINTERO entre 100 a 200 toneladas de

marihuana y se le entregaron a HUGHES 100 millones de dólares para Miguel Ángel CARO-

QUINTERO. S-5 dijo que durante las actividades de narcotráfico de HUGHES, HUGHES

sobornó a numerosos funcionarios mexicanos, incluyendo funcionarios de alto rango en las fuerzas

militares y en las fuerzas del orden público.

El 10 de octubre de 2001, investigadores del  Gobierno entrevistaron a S-5 acerca de las

actividades mercantiles ilícitas de narcotráfico relacionadas con HUGHES y Miguel Ángel

CARO-QUINTERO. S-5 les proporcionó a los investigadores del Gobierno una declaración jurada

indicando que la marihuana que los trabajadores de HUGHES contrabandearon de  México a los

Estados Unidos de aproximadamente 1985 a 1989 provenía de Miguel Ángel CARO-

QUINTERO. Más de 80 toneladas de marihuana estuvieron involucradas. S-5 identificó una

fotografía de Miguel Ángel CARO-QUINTERO como la persona de la cual HUGHES obtuvo

la marihuana durante este periodo. El Gobierno espera que testimonio comunicando

información similar proveniente de otro individuo que está cooperando sea presentada durante

la audiencia para la imposición de la sentencia para así establecer el ámbito y el alcance de la

empresa del acusado en el cultivo y distribución de marihuana, en caso de que dicho testimonio sea

necesario.

## IV. CÓMPUTO DE LA SENTENCIA

Las partes dan por entendido que la sentencia en este caso quedará determinada por el Juez a través de la aplicación de los factores de18 U.S.C. § 3553(a) y dada la naturaleza consultiva de la Pautas de Condenas de los Estados Unidos (USSG), emitidas conforme a 28 U.S.C. § 994(a). Este acuerdo declaratorio se basa primordialmente en la edición del 2009 de las Pautas de carácter consultivo. Las partes reconocen que ediciones previas de las Pautas de carácter consultivo pudiesen tener ciertas aplicaciones debido a las fechas de la conducta delictiva relevante que se alega.

Las partes dar por entendido que el Juez puede imponer cualquier sentencia, hasta el máximo permitido por ley, sin que cuente el alcance de cómputo de las Pautas, y que el Juez no está obligado por ninguna de las posturas de las partes. USSG § 6B1.4 (d). Las partes dan por entendido que la Pauta de  Condenas son de carácter consultivo. El Juez se encuentra en libertad, conforme lo establecido en USSG §§ 6A1.3 and 6B1.4, de llegar a sus propias determinaciones de los hechos y los factores de la sentencia tomando en consideración las estipulaciones de las partes, la investigación pre-condenatoria y cualquier otra información pertinente. USSG § 6B1.4 comentario; USSG § 1B1.4. Hasta donde las partes estén en desacuerdo con los factores de la sentencia, es la intención de las partes que los cómputos a continuación identifican los factores que no se encuentran en litigio. USSG § 6B1.4(b).

A.    Las partes dan por entendido que la Pauta de Condenas son de carácter consultivo, y  por lo tanto no le son obligatorias al Juez. Para los propósitos de este acuerdo declaratorio, los cálculos presentados se basan principalmente en los términos y disposiciones

del Manual de Pauta de Condenas de los USA del 2009. Las partes dan por entendido que

debido a la antigüedad del caso y el periodo de alguna de la actividad subyacente alegada, las

partes se pudiesen basar en diferentes ediciones o versiones de la Pauta de Condenas. La Pauta

de Condenas de los USA Sección 2E1.1(a)(2) para delitos RICO, dispone que el nivel delictivo

aplicable queda determinado por la actividad de extorción subyacente. En este caso, la actividad

subyacente es el tráfico ilícito de drogas. Para determinar la base del nivel delictivo en

Conformidad con § 1 B 1.3 and § 2D 1.1, las Pautas del 2009 disponen una base de nivel delictivo

de **38** cuando en el delito hay por lo menos 30,000 kilogramos de marihuana. El Gobierno

sostiene que el acusado estaba involucrado persistentemente en el cultivo y la distribución de

marihuana en la cual se implicaron más de 100,000 kilogramos de marihuana. El acusado

sostiene que la cantidad de marihuana implicada, como queda apoyado por pruebas creíbles, es

mucho menor de 30,000 kilogramos y se reserva el derecho a abogar por un nivel delictivo más

reducido. Sí el Juez determina que § 1B1.3 la conducta delictiva pertinente excede los 30,000

kilogramos de marihuana, la base del nivel delictivo será de un nivel de **38**.

      B.     La Fiscalía afirma que debería de haber una desviación ascendente de

cuatro niveles en el ajuste del papel delictivo en el caso de este acusado con base al puesto de

liderazgo ocupado por él en la organización. § 3 B 1.1 La defensa se reserva el derecho de

abogar por un ajuste más reducido, por que no haya un ajuste, y por una reducción del papel en

el delito. § 3B1.2 Conforme a la Fiscalía el ajuste al nivel delictivo sería de **42**.

      C.     La Fiscalía afirma que debe haber un incremento de dos puntos en el nivel delictivo

por tenencia de un arma de fuego, en conformidad con USSG § 2D1.1(b)(1), elevando el nivel

delictivo a **44**. La defensa se reserva el derecho a oponerse a tal ajuste. En parte la defensa

sostiene que la tenencia de armas de fuego en México, sí fuese apoyada por pruebas creíbles, no

apoyaría el ajuste. Sí la defensa está en lo correcto el nivel delictivo permanece en **42**. La

Fiscalía afirma que deberían de incrementarse dos puntos conforme lo establecido por §2D1 .1

(b)(3) debido a que una aeronave, otra que no fuera una línea aérea que regularmente tiene

horarios comerciales, fue utilizada para importar la marihuana a los Estados Unidos. Sí el Juez

determina que la Fiscalía está en lo correcto y falla que el ajuste §2D1.1(b)(3) aplica, el nivel

delictivo, conforme a la Fiscalía es de **46**. La defensa se reserva el derecho a oponerse a tal

ajuste a través de argumentos, pruebas y por lo contrario; en parte la defensa referiría la atención

del Juez al 3 de diciembre de 1987, fecha en la que se alega el uso de dicha aeronave en el Cargo

7; las Pautas de Condenas de 1988 no disponen un ajuste de dos niveles por el uso de una

aeronave. Sí la defensa está en lo correcto por lo que se refiere a la aplicación del aumento por una

arma de fuego, y el aumento por el uso de una aeronave, el nivel delictivo permanecería en un

nivel **42**.

D.    El acusado no califica para recibir el ajuste adicional de una "válvula de

escape" puesto que él no ha participado verdaderamente en una sesión informativa estratégica

con la fiscalía y él ocupa un puesto de liderazgo. USSG §5C1 .2. El nivel delictivo permanece

en **46** conforme a la Fiscalía y en **42** conforme a la defensa.

E.    Conforme lo establece USSG § 3E1.1(a), el acusado claramente ha demostrado

aceptación de responsabilidad a las acusaciones relacionadas con drogas a las que se está declarando

culpable. La Fiscalía respetuosamente afirma que el acusado debería recibir una desviación

descendente de tres niveles, resultando por lo tanto en un nivel delictivo de **39** conforme a la

defensa y de **43** conforme a la fiscalía.

F.    Las partes dan por entendido que el cómputo del historial delictivo del
acusado es tentativo. La categoría del historial delictivo (CHC por sus siglas en ingles) queda
determinada por el Juez. En esta fase, parece ser que el acusado tiene un historial delictivo
limitado, resultando en un CHC de I.

G.    La máxima sentencia establecida por ley por el Cargo Uno es de 20 años (**240**
meses) de encarcelamiento. El máximo periodo de encarcelamiento en el Cargo Uno de la Regla
20 caso de traslado es de cinco años (60 meses) de encarcelamiento. Conforme a lo establecido en
este acuerdo declaratorio, la Fiscalía está recomendando una sentencia combinada de las
imputaciones de sentencia condenatoria de Arizona y Colorado. La Fiscalía por la presente declara
que la Fiscalía abogará por una sentencia que incluya un periodo de encarcelamiento de 20 años
(**240** meses). La defensa se reserva el derecho de abogar por una sentencia más reducida. En
conformidad con la Regla 11 (c)( 1 )(C), sí el Juez determina que es necesario imponer una
sentencia de más de 20 años de encarcelamiento de las dos imputaciones de sentencia
condenatoria basado en la aplicación de de 18 U.S.C. § 3553(a) los principios y las
circunstancias de este caso, le será permitido al Acusado retirar sus declaraciones de
culpabilidad, sí elige hacerlo, entonces las partes pueden proceder a juicio. Sí el Acusado
retira sus declaraciones de culpabilidad, la Regla 20 caso de traslado será regresado al Distrito
de Arizona en función de la Regla 20. La gama de las Pautas resultando del cálculo del nivel
delictivo de **43**, y el I tentativo de CHC, es Cadena Perpetua. Como una condición de la
extradición del acusado, la Fiscalía le garantizó al gobierno de México, que no se sentenciaría al
acusado a Cadena Perpetua. En conformidad con el tratado entre los Estados Unidos y México,

Página número 35 de 38

el Acusado no puede ser sentenciado a Cadena Perpetua. La gama de las Pautas que resultan del

cálculo de nivel delictivo de **39**, y el CHC tentativo de I, es de 262 a 327 meses. Sin

embrago, con el afán de ser tan precisos como sea posible, siendo el CHC indeterminado en

estos momentos, se calcula que el nivel delictivo de 39,  concebiblemente que resultase en un

alcance de 262 meses (lo más bajo de la Categoría I con una base de nivel delictivo de 39) a

Cadena Perpetua (lo más alto de la Categoría VI con una base de nivel delictivo de 39).

H.      En Conformidad con USSG § 5E1.2 y 21 U.S.C. § 841(b)(1)(D) y 18 U.S.C. §§

1961, 1962 y 1963, suponiendo que sea un nivel delictivo de 38 o mayor, la multa por  este

delito es de $25,000.00 a $250,000.00 más los intereses y multas aplicables.

I.      En Conformidad con 18 U.S.C. § 3581, el Cargo Uno de la Acusación Sustitutiva

de jurado acusatorio  en el caso de Colorado alega que éste es un delito mayor con agravantes

Clasificación B. En Conformidad con el Título 18 U.S.C. § 3583, el Juez puede imponer un

término de libertad supervisada de cinco (5) años o menos en el antedicho Cargo Uno. La

Fiscalía solicitará un periodo de libertad supervisada de cinco (5) años. La defensa se

reserva el derecho de solicitar un periodo más corto de libertad supervisada. En Conformidad

con  21 U.S.C. § 841(b)(1)(D), el Juez debe de imponer un periodo de libertad supervisada por

lo menos de dos años en el Cargo Uno de la Regla 20 del caso de Arizona.

## V. <u>PORQUE LA DISPOSICIÓN DEL ACUERDO DECLARATORIO ES ADECUADA</u>

Las partes creen que la gama de la condena resultante del acuerdo declaratorio propuesto

es adecuada, puesto que toda conducta relevante directamente atribuida a este acusado ha sido

revelada, las pautas de la condenas tomarán en consideración todos los factores pertinentes

concernientes a este acusado, y las acusaciones a las cuales éste acusado a acordado a declararse

culpable, reflejan adecuadamente la gravedad de la conducta delictiva.

Este documento establece la totalidad del acuerdo entre las partes. No existen ninguna

otra promesa, acuerdos (o "acuerdos por el lado "), términos, condiciones, entendimientos o

garantías, expresadas o implícitas. Al entrar en este acuerdo, ni la fiscalía ni el acusado se han

basado o se están basando en ningún término, promesa, condición o garantías que no hayan sido

expresamente declaradas en este acuerdo.

La oferta representada por medio de la transmisión del acuerdo declaratorio propuesto

queda retirada a menos que el acusado en o antes de junio 9 de 2009, indique su intención de

aceptar el acuerdo declaratorio al interponer formalmente una notificación de disposición y una

solicitud para cambio de fecha de declaración, al firmar el formulario de consentimiento de la

Regla Rule 20 para que se transfiera el caso del Distrito de Arizona y adicionalmente le solicite

al Juez licencia para retener o suspender cualquier pedimento previo al juicio presentado por la

defensa hasta la fecha en la que se efectúe el cambio de declaración. Sí el cambio de

declaración se lleva a cabo y el Juez acepta la declaración de culpabilidad a el Cargo Uno del

caso de Colorado y del caso de traslado Regla 20 todo dicho pedimento se considerará teorético de

aquí en adelante.

Así queda acordado:


Miguel Angel Caro Quintero 11/6/09
MIGUEL ANGEL CARO-QUINTERO    Fecha
Acusado

_____ 10/6/09
WALTER B. NASH III    Fecha
Abogado por el Acusado

Página número 37 de 38

JOHN M. RICHILANO                    Fecha
Abogado por el Acusado

STEPHEN G. RALLS                     Fecha
Abogado por el Acusado

GLENN ALEXANDER                      Fecha
JOHN GILLIES
JIM FAULKNER
Abogados Litigantes
Abogados por la Fiscalía

GUY TILL                             Fecha
Delegado de le Fiscalía Federal de los USA
Abogado por la Fiscalía

SUSAN (ZEKE) KNOX                    Fecha
Delegada de le Fiscalía Federal de los USA
Abogada por la Fiscalía

MARK J. BARRETT                      Fecha
Delegado de le Fiscalía Federal de los USA
Abogado por la Fiscalía

## CERTIFICATE OF TRANSLATION

I, Bety Ziman, hereby certify that the previous attached document is an accurate translation of the following-attached document and that I am competent to render such translation in English and Spanish.

The undersigned translator is a Certified Federal Interpreter, Certificate number 02-023, is certified by LionBridge Federal as a Spanish/English, Hebrew/English Interpreter and evaluator, and by the National Consortium of State Courts, registration number 07-70 is the holder of a certificate from the University of the Arizona Institute of Court Interpretation, as well as from the Institute for Interpreters and Translators in Monterey Cal., and is a member of the National Association of Judicial Interpreters and Translators, of the American Translators Association, and of the Colorado Association of Professional Interpreters

Signature: _Bety Ziman_          Date: _9/16/09_

Bety Ziman
255 S. Holly St..
Denver, CO 80246